The first matter is Price v. Warren. May it please the court, my name is Sean Andrews, CAIR appointed counsel for Alonzo Price. I reserve, with the court's permission, two minutes for rebuttal. Let me ask you this. If you lose on the issue of the suppression, what's left of your ineffective assistance of counsel? Well, it's an ineffective, as the Certificate of Appealability says, it would then be ineffective assistance of trial performance. That is, assuming admissibility, what did counsel do and not do at trial? Well, and the first counsel did try to suppress the cigarette because of the chain of custody problems. In the 2001 trial, counsel moved to suppress based on essentially the fact that it was not discovered by officers and not discovered contemporaneously with the crime scene investigation. So that's looking at the frame before discovery of the cigarette butt. But the question is, did he try and fail to suppress the cigarette butt? Yes. Why isn't that ruling the law of the case here? No one's mentioned it in the brief, but it occurred to me as I read the briefs, we've got a ruling at the first level, first trial level, that the cigarette butt should not be suppressed because of chain of custody issues. Why isn't that law of the case, which takes the issue away, which is why I began with my first question, what's left? Well, if it's law of the case, it's law of the case as to what was put in that motion to suppress. And what was in that motion to suppress was solely an argument about the failure to find that cigarette butt during the crime scene investigation. Okay. That was the argument. I'll tell you one other thing. Help me. This is my biggest problem, actually. Let's take the cigarette butt out of the case. Okay. The cigarette butt. If this were here on purely sufficiency of the evidence, would you agree you could not win, that there's enough evidence absent the cigarette butt to get a conviction? There is. If we were in a Jackson versus Virginia context, yes, there's sufficient evidence. But that's not the inquiry. But it goes to part two of Strickland, doesn't it? Wasn't it official prejudice? Well, as we've said in our reply brief and as this Court has said, the Strickland inquiry isn't a mere sufficiency of the evidence inquiry, where we just isolate and then look at the remainder of the evidence. We look at the entire case, including the weaknesses. This is in cases like Brake Iron and other cases by this Court that we've cited. So the fact that evidence may be sufficient doesn't answer the question. Nope. I'm sorry. If there was an admission erroneously of the cigarette butt, is there a significant probability that this person would have been convicted? And the fact that the piece is disrupted around. Let's say it is suppressed, and you've got matching carpet fibers, matching wood fibers, voice identification, and the 29th Virginia crisis, rebutted assertions that he was at home all night, and his absence from work following each of the burglars on the 22nd and 29th, are they damning pieces of evidence? On the last point, he was not absent on the 29th. He was about an hour late to work. But, again, you're focusing on suppression. You're saying if the evidence is suppressed, then he goes to trial with this other evidence. I mean, if the Strickland inquiries, and we're talking about suppression now, if the Strickland inquiry is going to eliminate that evidence and focus on the remainder, there would be sufficient evidence to convict. But we still have the claim about deficient performance at trial, which is to say, assuming the evidence was properly admitted, what happened then? There's so much other evidence that, indeed, is overwhelming. The case was full of holes, as the chain of control was. Absolutely, Judge Roth. It goes to the entire integrity of the investigation in a criminal case, in which those detectives, those two detectives, were central. They were a core of the prosecution's case, the integrity of this entire investigation. We look back at this. There's a black hole in terms of the chain of custody. No contemporaneous report. Detective Skoll has a 30-page typed investigation report. It documents all the events from the Hamer crime through Perez on June 29th through early July, even up through October. Not a word about the cigarette butt. Not a word about Carmen Pierce. You don't mention the cigarette butt. Let me pick up on something that was embedded in Judge Ambrose's question, and that is that in New Jersey, chain of custody goes to probative weight and not to admissibility, which would suggest that an attempt to suppress would have been futile anyhow, number one. And number two, I thought that the Second Counsel did try to call into question the integrity of the evidence, the cigarette butt evidence, by cross-examining the witnesses, the police witnesses. But isn't it, haven't we moved beyond that now to the issue of the credibility of the evidence that was presented? And when there is an important factor that has a strong credibility attack, that that can spread to the rest of the evidence and finding beyond a reasonable doubt that there was. Because we're talking, Judge Roth, we're talking about the integrity of the investigation. And when we talk about this other evidence, let's be clear. The cigarette butt, DNA evidence. DNA evidence used by the state to put Mr. Price not just at the crime scene, but up on the roof, which was the burglar's point of entry, a burglar who reportedly smelled like he had just been smoking. We look at the sequence of the trial to see the significance of the cigarette butt. Who's the first lay witness who's not a victim? It's Carmen Pierce. How does the state close with the DNA expert? Look at the state's closing. This was central evidence. Look how the trial judge characterized an emotion for new trial because of insufficient evidence on the Hamer crime. She seizes on the cigarette butt. And, you know, not only the integrity of the investigation, we have to remember here these are two crimes that the state linked together on a unitary theory that there must be one and only one perpetrator. Well, let's not ignore. That's their argument based on the M.O. That's their argument, but they have to take the bitter with the sweet. So let's look at Sadie Hamer. She's known Mr. Price most of her life. She is asked because she, the perpetrator, her perpetrator spoke to her. She's asked, did you recognize the voice? No. Even though Detective Skoll went back, paid her a visit, brought up Lonnie Price in October, she testifies, no, she doesn't. Did they listen to Severn? Yeah, Severn Charles. I don't believe there was. She testifies the voice sounded young. She's about 40, about to turn 47. Mr. Price is about 40. And we have the size discrepancies. She estimates 5'8"-5'9", $1.75. This is a large man, 6'3", 2'25". She says, and she, her perpetrator left the TV on, so there's some light before she ultimately is blindfolded with a pillowcase, unlike Perez's perpetrator who shut it off. She said she appeared to see a red shirt. There's no recovery of any red shirt. And I have to correct something, by the way, in the state's brief. The state's brief says at page 7 that, quote, Hamer had mentioned Price as a possible suspect in her kidnapping prior to the Perez kidnapping. That's false. The two sites don't support that at all. Those two sites are about the Perez crime, not about Hamer. All the officers heard about Lonnie Price at that point was a rumor from Michael Toney, and he admitted he didn't have any basis to substantiate or know anything about the woman. What do you think about the epidephrine? It's assumed that, and they're wrong in suggesting to you that if this were here on direct appeal, the arguments you're making would have a lot more force than they do with you through the eyes of epidephrine. Well, there's a question whether epidephrine extends to this issue we're talking about, which is Strickland prejudice on the outcome of the trial, because as I read the state court decisions, the appellate division didn't adjudicate prejudice. And the appellate division said we adopt substantially the reasons of the trial court, the Superior Court of New Jersey. When we look at that decision, as we pointed out in our opening and reply brief, that judge, Judge Batten, was careful to note when he was adjudicating Strickland prejudice because he was invoking the reasonable probability standard, but not on this. Not on this. To your second question, Judge McKee, I didn't answer your second question, which is didn't counsel do something here? And this gets to the nub of, I think, a central flaw in the state court's decision. Did counsel, ineffective assistance claims are not limited to scenarios where counsel is asleep at trial or stands mute. Did counsel ask questions about the cigarette butt? Yes. Is that going to this issue of attacking the chain of custody for a client maintaining he's innocent? No. So, if we look at what the state court did, the trial court quoted from transcript where there's discussion about the butt. He says, Detective Olbrich was questioned. By the way, in that colloquy he quotes, the trial judge quotes, there's no question about the cigarette butt itself. All Olbrich asks is, who went on the roof? Did Coffin go on the roof? Did you go on the roof? Did you see anything? Yeah, but nobody's questioning the connection to the black hole a few minutes ago. There's no black hole with regard to where Coffin came up with in connection with the carbon fibers or the purifier. On chain of custody, no. I mean, in the sense that that's law, Detective Olbrich, Your Honor, but in the sense that this information is, this is what is so bizarre here. When you bring up that other evidence, Skoll, as I was saying before, Detective Skoll, in his 30-page report that goes through this into October, never mentions the cigarette butt once. The grand jury convenes on October 24th. We're now four months after the crime and after the recovery of the cigarette butt. The grand jury convenes. Detective Olbrich testifies, and this is in the federal record, the grand jury transcript. Detective Olbrich testifies and makes a big deal about the cigarette butt being recovered. Two days later, October 26, 2000, Detective Skoll returns to the Perez apartment, starts photographing that photo you have in the record with the paint cap lid, and then prepares a supplementary investigation report. It's dated October 26, 2000, the day he went and photoed, and that's the purported chain of custody for the cigarette butt. That's where he says, never appeared in the 30-page report, he says, I went to Perez's, I put it in a small brown envelope. Pause, by the way, because Perez testified at trial that it was not, it was put in. Did you save time for rebuttal? Yes. Okay. I'm sorry. Thank you. I didn't really ride the red light that tightly, but we're on an incredibly tight schedule this morning, so I've got to be more rude than I'd rather be. Thank you. And while Ms. Bickling is coming up, you're not from Duke, are you? I am from Duke. Oh, okay. All right. We have a policy, as you may know, because I didn't see your name on the brief, that when we have a case represented by a law clinic, we really want to have the law students argue the case, which is why we give them argument. We understand because the bar exam, there's a time issue, but just I wanted to reinforce that to you and your colleagues, that when you represent a case, it's really our preference that the students argue the case. It's our preference to Your Honor. Okay. It's the bar exam that goes to court. I understand. Thank you. Okay. Good morning, Your Honors. May it please the Court, I'm Gretchen Pickering. On behalf of Charles Warren and Jeffrey Chesa, the Acting Attorney General of the State of New Jersey. Before I get into my argument, I would like to address a couple of the questions that you have already raised to Mr. Andrusier. I wanted to clarify one element. Judge McKee, you had asked whether or not the first counsel had argued about the chain of custody for the cigarette butt and the likelihood of switching the evidence. And that was, in fact, argued on the motion to suppress. It may not have been briefed, but it was raised in argument after Mr. Patrick, who is the attorney, spoke to his counsel, or excuse me, spoke to his client. That issue was specifically raised on the first motion, and it's in the trial transcript. I have it on page 20 of the trial transcript from the first motion to suppress. So it was addressed. I don't want to read it to you, but it was specifically addressed, that particular question, and it was raised by defendant to his attorney. Was it raised, excuse me, to suppress the butt, or once the butt was raised, once the butt was admitted as to the impeachment evidence? I believe it was raised with respect to suppression. This was on the motion to suppress, the oral argument on the motion to suppress where this was raised. So it had not been admitted at that point in time when this was raised. Is that wrong of the case? No one's really briefed that, but it came to me as I was reading the brief. Why wouldn't that really be law of the case, particularly if that was raised? I don't disagree, Your Honor, that it should be law of the case. It certainly does. I would say that it is the law of the case because it's the same parties, the same judge, the same court, and the only reason why it did not carry, there was a second trial, was because of issues with a juror. So I would argue that it is law of the case, and you're correct, Your Honor, it was not briefed. The focus of the brief was more on the issues related specifically to the Certificate of Appealability. But I do agree that I think it would be considered law of the case under the circumstances, under New Jersey law at least, and under federal law, that that would apply. But they didn't suppress it anyway, or move to suppress it. The question that my colleague Judge Roth asked, frankly, in reading the brief until I got the appellate's brief, until I got to the very end, and I'll mention that to Mr. Ondrazer, just before he was handing the cigarette, at least for me, it was hard to read that brief and not get concerned about whether or not the cigarette was planted. I think that was a concern from a lot of people. And one of the key things about this piece of evidence, and this does go to some of the issues of credibility that Judge Roth had raised, this is not evidence that was collected by the police. I think they have said that repeatedly. They admitted the oversight. It was taken and put in the bag, but someone put it on the roof. My suggestion is that the police may have put it on the roof after they went and inspected the apartment. Yes, Your Honor. That's supposing that the butt found on the roof was the butt that was eventually entered into evidence. There were several issues related to that cigarette butt, Your Honor. The issue that was presented initially, there have been issues with respect to whether it had been planted by actually the woman who found it, was one issue that was raised at trial. There was issues as to whether or not the police went back and planted it. There were questions as to whether it was actually there when the police first did their crime scene investigation in the early hours of the morning. There were a lot of questions about that. But isn't the biggest question, the most serious question, was the butt that was picked up on the roof the butt that eventually was entered into evidence, or was there a switch? Now, that goes to police misconduct. But at the same time, I think there is a valid argument on the chain of custody. You know, why wasn't the cigarette butt mentioned in the carefully detailed list of what was found? Where was it? Why, when you're considering effectiveness of counsel, why did defense counsel concede that it was the defendant's DNA on the cigarette butt? I mean, that to me, in and of itself, almost seems like ineffective assistance of counsel. I understand your concerns, Your Honor, and I will address them. And one of the points I wanted to make with respect to this cigarette butt and as to why it would not have been on any of the detailed logs as to what was found at the site was because the detailed logs were the logs by the police done at the time of their crime scene investigation and were not supplemented with things found by other people. They were literally everything that was found at the date and time put together by the crime scene investigator. So this piece of evidence was found 12 to 18 hours later, 12 to 16 hours later, excuse me, it was found by the friend of the victim. She actually went out onto the roof and picked it up and took it off of the location. Yes, with a piece of tissue. So she did not get fingerprints on it. I don't want to suggest that she did it that way. However, she went and moved it so that it could not have been found subsequently by someone and then brought it back into the house. So that piece of evidence is not going to necessarily be treated the same way as a piece of evidence found by the police during their crime scene investigation. If it comes to the police attention and the police physically take custody of it, why wouldn't they treat it the same? They still have to be concerned about the integrity of the physical exhibit, don't they? They do, Your Honor, but they're not going to change their logs created at the time of this search. They made no notation at all that this was put. And, in fact, it wasn't even put in the evidence locker, was it? I think there was evidence, and that was Detective Scull's testimony. Don't you have to log evidence into the evidence locker? You don't just go along and toss it. Oh, I don't disagree with you, Your Honor. I don't disagree with you, Your Honor, that there is a log missing. The logs that have been put into evidence here are the logs that were created at the time of the investigations. There is not, and I did not find in the record, a log back at the station of everything that had gotten put in and stored at the police department. Well, is there anything other than the cigarette butt that was put in at a later time that wasn't logged? No, everything else was found by the police officers. All right. So, I mean, I think that's rather relevant evidence. I don't disagree. In arguing that is this man guilty beyond a reasonable doubt when this cigarette butt suddenly floats up months later and you wonder is this really what was found on the roof? I don't disagree, Your Honor, but under New Jersey law, that kind of information, that kind of question about the chain of custody does not go to the admissibility of the evidence. Right. I'm not talking about admissibility. I'm talking about credibility. It undermines that particular piece of evidence. I don't know that I would agree that it undermines every piece of evidence that was collected by the police officers. There were three different police officers or five. But at the same time, the jury consideration of the evidence before us is, wow, I mean, look, this is sort of funny about the cigarette, but I wonder if anything else funny happened that we don't know about. It certainly does cast that fall. To me, the only thing worse, in terms of the defendant's perspective is, is a uncoerced admission. I mean, it is incredibly damning, DNA evidence is. And to not do as Michael, I guess, is suggesting, seems to be tantamount to a slow guilty plea. And then you can add on that the saliva that was found on the rest of the pillow did not match price to the four bullets. So it wasn't bad at price. And so that's the case where DNA goes unerring, or at least 10 goes unerring. It's possible, yes, I agree that the saliva that was found on the pillow case did not match price, and that is clear. And that, as Detective Ulbrich testified, his initial theory had been that the assailant had used his teeth to rip the shreds of the pillow cases to tie up the victims, both of the victims. And as he testified at trial, that theory was undermined by the fact that there was no, the saliva was not found matching price on the pillow shreds. And something more important there, because she's the one who did the voice ID. So if you can cast aspersions on the validity of the voice ID, it seems to me that's a major, major hole in the prosecution's case. It is, but they didn't cast, I mean, they tried to undermine the voice ID by cross-examining her. And they cross-examined all the police officers as to when she first told them who she thought the assailant was. And every single one of them said, she told us the day we were there doing the crime scene investigation, the day of the incident, she told us that she recognized the voice of Lonnie Price, and she knew the voice because he used to call into the pharmacy where she worked, and she spoke to him on the telephone repeatedly. So the voice ID, they did try to undermine the voice ID, but the voice ID is still a very strong and powerful piece of evidence on that. And it was not shaken at all by any cross-examination of Mrs. Perez. Well, I will say that the fact that you never talked to someone in person, you've only heard them on the telephone, your telephone voice isn't necessarily the same as your speaking voice. Agreed, but I think there was also testimony that she did speak to him when he came into the pharmacy. So there was two different ways that she had spoken to him. So she was aware of his voice from both avenues, and she survived cross-examination on that. They did not undermine it in any way. I think it's still very strong. I think, yes, the telephone could be a different situation, but I also think that she testified that he came into the pharmacy as well and that she spoke to him there. So I think that the voice identification is very strong evidence. I think with respect to the cigarette button, and I'm kind of running out of time quickly here, so I did want to get quickly to my argument on this, and that is that, as you pointed out earlier, there is a doubly deferential standard, if you will, under the ADEPA, as well as Strickland, which is a prevailing argument. And I think the defendant has not proven what he needs to prove in order to prevail on habeas relief here, and that is he has to prove that the decision by the most, I guess the highest state court to address the issue on the merits, which was the PCR court, was clearly contrary to Strickland, that it was an unreasonable application of Strickland, or it was based on an unreasonable determination of the facts. And I think the fact that this is DNA evidence is making it adds a level of severity to this. But on the determination of the facts, the court didn't even consider some of the facts that were argued, which are very crucial facts. Now, isn't that an unreasonable determination of facts? No, I think the court did consider those arguments and, in fact, listened to the PCR attorney's full argument about switching the evidence. And during that argument, she actually admitted that there was no evidence supporting her theory. She said, is there a problem with there's no evidence? No, she didn't think there was a problem. And the court said, really, you don't think there's a problem, there's no evidence supporting your theory? There wasn't any evidence. The evidence is an absence of it. You have Detective Scull's testimony about the chain of custody, and he did testify that he took the material, he took it back, he had it in a brown envelope, he wrapped it with evidence tape, he initialed the evidence tape, and he had Detective Sergeant Brennan write on there where he found the details about that particular piece of evidence. The police reports, the police reports aren't evidence. They were not admitted in state court. They can be used for cross-examination, they can be used to refresh a recollection, but they aren't admitted as evidence because they're hearsay. So those are not the evidence that was before the court. What is before the court was the testimony of Detective Scull that was challenged extensively, but I would not say it was undermined. And then you have the PCR attorney who says there was no evidence. I have no evidence for my theory. So I don't think it's an unreasonable determination of fact when the attorney arguing it admits there's no evidence to support the theory. Well, there was no evidence of a switch. Yes, there was no evidence of a switch. That is not the crucial point in effective assistance of counsel in a failure to challenge the chain of custody. The failure to, you know, I mean, I tried a lot of cases, not criminal cases, but cases that required proof of a chain of custody. And it's vital to a case where you have important evidence to be able to show that that particular bit of evidence hasn't just been picked up off a table somewhere, but is in fact the very thing that was found at the scene and we know everyone who had control of it until it is brought into the courtroom. And we don't have that here. I think that's the big lack, and that's the lack that the PCR court really didn't go into. And I think the failure to consider that lack of challenge of the chain of custody is an unreasonable interpretation of the facts of the case because the PCR court just pushes that aside. Your Honor, I think that there was testimony. I think that there are very, very different ways of demonstrating a chain of custody. Under the circumstances given this particular piece of evidence, it was the testimony of Detective Scull. There is no log. It's admitted. There are no photographs, diagrams, or anything of the sort. That is all admitted. I'm not saying it's the best police practices in the world, but I am saying that there is a way to prove chain of custody, and they had Detective Scull on the stand, and Detective Scull set forth the chain of custody that he did. You also had Carmen Pierce on the stand who talked about her discovery of the evidence. Is there a hole for the 12 hours between when the CSI people were there and when Carmen Pierce was there? Yes, and they can't account for that, and there's nothing you can do about it. They have various theories, but it is still a 12-hour period. Is there a hole in the four months between the time the cigarette butt was picked up and there's a record of the cigarette butt being evidence? The cigarette butt was in the evidence locker and transferred to the lab on July 6th. How do we know? Because it's in the log. There's a log transferring all of the evidence that was found in this case from the state police to the lab that was dated July 6th of that year. Four months later? No, it was not four months later. The incident occurred on June 29th. It was seven days later. So the cigarette butt was in evidence at that time and was transferred. There's issues about the plastic bag that Mary Helen Perez says he put the cigarette butt into. But Carmen Pierce, as well as Detective Skull, said, I put it into a brown envelope, and then there's testimony about how you process evidence when you're dealing with biologics that you put them into paper envelopes. So the plastic bag wouldn't have made sense, and two of the three said it was in a brown envelope and then you have Detective Skull's testimony about the tape and the initials. But there's also testimony. There is a log that is in evidence. Ms. Gray, you cut off in mid-sentence, but I did that to make sure I'm using it so I feel like I've got to be equally rude to you. But thank you for your argument. Thank you, Your Honor. Well, Ed, if you do have a chance to finish an argument, submit a 28-day letter to us, and we'll certainly consider any written submission afterward that you want us to take a look at if you feel you didn't have enough chance to develop your argument today. Hi. Thank you, Your Honor. On the point about no evidence of tampering, it would be pretty darn hard to imagine a scenario with direct evidence of tampering. Imagine a scenario where the state actually goes to trial trying to put on that evidence in the face of that. It's not needed. The state as a proponent of evidence has the burden to authenticate the evidence it's putting on. By analogy, you could, and Judge McKee, you authored an opinion that we cited, Grant v. Lockett, a few years ago, ineffective assistance because counsel doesn't impeach a state witness based on a pending parole violation. There didn't need to be proof of a special... Some of what I said, Grant, is in question because of the majority procurement, and Bach opinion in Dennis where there's, frankly, some loose language in Grant. Well, I'm talking about the issue that there need not be proof of a special deal, a quid pro quo, to impeach. And so there need not be proof of tampering. There are a lot of irregularities in this case, not just about this hole. There's irregularities of what happened, which I won't get into, but earlier that afternoon where the evidence shows the officers targeted Mr. Price with what the PCR court called an illegal arrest, followed by what the state conceded at the PCR hearing was an illegal voice identification procedure. There's a lot of irregularity in the case. On the voice ID, we've laid that out. I just want to be clear in response to this, what was argued here. Ulbricht's report, Perez gave a statement, tape recorded statement, asked about the voice, never mentioned Mr. Price. It comes from Ulbricht's report. He wrote, not positive, not certain, sounded like the voice, might be, reluctant to say it couldn't have been someone else when it's relying on the sound of the voice. And finally, again, there was a chain of custody argument for counsel to make to get his DNA off the roof. Counsel deprived him of it by that stipulation. Thank you, Your Honor.